J-A05003-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| LESLIE TAYLOR | : | No. 2321 EDA 2018 |

Appeal from the Order Entered July 31, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): MC-51-CR-0006578-2018

BEFORE:   OLSON, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                    **FILED JULY 20, 2021**

The Commonwealth of Pennsylvania appeals from an order entered in

the Criminal Division of the Court of Common Pleas of Philadelphia County on

July 31, 2018, which denied its motion to refile certain charges against

_____

[*] Former Justice specially assigned to the Superior Court.

J-A05003-21

Appellee, Leslie Taylor (Taylor).[1,2]  In the order, the trial court concluded that

the Commonwealth failed to establish a *prima facie* case that Taylor

committed the offenses of aggravated cruelty to animals – torture,[3] criminal

_____

[1] As our caption illustrates, this appeal was taken from an order entered in the court of common pleas in a case which retained a municipal court docket number.  We considered appeals involving similar circumstances where no party has objected.  As explained in a prior decision:

> Under the Rules of Criminal Procedure, the Commonwealth had the power to re-file the complaint "with the issuing authority who dismissed" the [applicable] charge.  **See** Pa.R.Crim.P. 544(A); Pa.R.Crim.P.1003(E)(1) (providing that preliminary hearings in Philadelphia municipal court be conducted, with exceptions not here relevant, in conformance with Pa.R.Crim.P.544).  The Commonwealth had the option of filing a motion requesting any subsequent preliminary hearing be held in front of a different issuing authority.  **See** Pa.R.Crim.P. 544(B).
>
> After the complaint was re-filed, this case retained its municipal court docket number, and the hearing notices were captioned in the municipal court.  There is no indication [within the certified record that] the Commonwealth filed a motion requesting the hearing be held by a different issuing authority.  However, a judge of the Philadelphia Court of Common Pleas held the second hearing.  No party has objected to this procedure.

***Commonwealth v. Montgomery***, 192 A.3d 1198, 1199 n.2 (Pa. Super. 2018), *affirmed* 234 A.3d 523 (Pa. 2020).

[2] So long as the Commonwealth certifies in its notice of appeal that the order terminates or substantially handicaps the prosecution, our case law, pursuant to Pa.R.A.P. 311(d), treats an order dismissing charges at a preliminary hearing for lack of evidence as an interlocutory order from which the Commonwealth has an automatic right to appeal.  ***See e.g., Montgomery***, 192 A.3d at 1198 n.1 (Pa. Super. 2018) (noting this Court's jurisdiction because Commonwealth certified that the dismissal substantially handicaps its prosecution).

[3] 18 Pa.C.S.A. § 5534(a)(1).

- 2 -

conspiracy,[4] and animal fighting – amusement or gain.[5] After careful review, we reverse and remand.

A preliminary hearing was held on June 5, 2018 at the municipal court level.[6] At the commencement of this hearing, the municipal court ordered sequestration of "all witnesses." N.T. First Preliminary Hearing, 6/5/18, at 3. Thereafter, the Commonwealth called Officer Wayne Smith to testify. Officer Smith testified that he is a 16-year veteran enforcement officer with the Pennsylvania Society for the Prevention of Cruelty to Animals ("SPCA"). In that capacity, he enforces animal cruelty laws, receives training in animal cruelty and agricultural law, lectures annually on blood sport, and has testified as an expert in the common pleas courts "50 plus times." *Id.* at 5-6, 17-18. He explained that he is familiar with the equipment, medication, and procedures used in dog fighting because he has participated in "hundreds" of investigations and arrests. *Id.* at 6. The municipal court certified Officer Smith as an expert in animal cruelty but did not permit him to offer opinions about the medical status or condition of an animal. *Id.* at 20.

---

[4] 18 Pa.C.S.A. § 903(c).

[5] 18 Pa.C.S.A. § 5543(1).

[6] Taylor and his four co-defendants, all represented by counsel, attended the June 5 hearing. Each defense attorney, on behalf of his respective client, cross-examined the Commonwealth's witness.

Officer Smith further testified that on March 10, 2018, the SPCA and Philadelphia Police Department ("PPD") received a complaint of animal fighting on the 1200 block of 35th Street in Philadelphia. *Id*. at 7. At approximately 7:00 p.m., Officer Smith began surveillance by observing the location from under a bread truck. *Id.* Soon after Officer Smith arrived, a gentleman walked down the street using the speaker phone feature of his cellular telephone. Officer Smith testified that the man "was banging on a garage door yelling 'where are you guys at.' You could hear on the speaker." *Id.* Based on what he heard of the cell phone conversation, Officer Smith informed SPCA Director of Law Enforcement Nicole Wilson, that the location was 1213-1214 South 35th Street. *Id.* at 8.

At 7:45 p.m., two Black males pulled up in an older black pickup truck and entered a small roll-up door at 1214 South 35th Street. *Id.* at 8.[7] These men picked up a carpet from the back of the truck and took it inside the garage. *Id.* Officer Smith observed groups of five to ten males enter the small roll-up door, which he memorialized in photographs that were admitted into evidence. *Id.* at 9, 10. A doorman guarded the roll-up door through which each man entered. *See Id.* at 13, 37. Officer Smith observed over 50 people enter the property. *Id.* at 12.

---

[7] Officer Smith explained that the garage had a large bay door with a small roll-up door beside it. The small roll-up door is where individuals entered. N.T. First Preliminary Hearing, 6/5/18, at 11-12.

At approximately 8:00 p.m., co-defendant Brian Peterson walked a black-and-white pit bull to the premises, picked it up, and carried it through the small roll-up door at 1214 South 35th Street. Officer Smith photographed Peterson with the black-and-white dog as he entered the property and identified Peterson in court. *Id.* at 9-10, 12. At some point, Peterson brought the dog back outside and put it into his vehicle. *Id.* at 37.

Soon after, another man approached the garage with a tan-and-white pit bull. *Id.* at 10. Officer Smith photographed the man enter the garage with the tan-and-white dog. *Id.* at 12. Once this man was inside, Peterson retrieved the black-and-white dog and walked it inside the garage again. *Id.* at 10. At this point, the roll-up door was closed. *Id.* at 13. Officer Smith informed Director Wilson that the dogs were inside, and he believed the dog fight started. *Id.*

Officer Smith took his truck around the building to block other streets. As he walked back around the building, he observed PPD and SPCA officers "banging and kicking and announcing their presence." *Id.* at 14. He then saw the large bay door go up and "a flood of people came out." *Id.* He pursued these individuals as they ran from the garage. Officers subsequently apprehended 15 individuals along the sidewalk, including Taylor and his co-defendants, Peterson, Robert Parks, Hassan Munson and Michael Easton. *Id.*

When Officer Smith entered the garage, he observed a makeshift ring and a red carpet within it. *Id.* at 15-16. Officer Smith took a photograph of this and explained that "the red carpet [] is used for traction. They laid that down and put the ring around it and that will keep the dogs from slipping all over." *Id.* at 21. Officer Smith described the red carpet as new and the ring as temporary. *Id.* There were several motorcycles, dirt bikes, and four wheelers on one side of the garage. *Id.* at 15.

Officer Smith saw the black-and-white dog inside the bathroom of the garage and described it as "badly injured" with "injuries to the top of the head and the muscle and chest area." *Id.* at 16. A photograph of the black-and-white dog in the bathroom showed injuries to the dog's head, face, muscle, and leg. *Id.* at 23. The tan-and-white dog ran away but was later captured and presented with "injuries to the legs, chest and face." *Id.* Officer Smith authenticated photographs he had taken of the tan-and-white dog. *Id.* at 24.

Officer Smith testified that, after a dog fight, dogs typically have bites to the face, chest, and legs because "[w]hen the two dogs go at it, they are face-to-face and try to grab on the first thing which is the face, chest and [legs]." *Id.* at 20. He affirmed the dogs he observed at the garage had injuries to the face, chest, and legs. *Id.* Officer Smith further testified that he found "a milk, Dawn dish washing liquid, and rubbing alcohol" mixture inside the bathroom, which he explained is commonly used in dog fighting to

wash the dogs before a fight to "make sure there is no poison or impurities that will stop a dog from latching on." *Id.* at 22.

Officer Smith testified another officer secured a search warrant. *Id.* at 25. Inside the makeshift ring, officers found a black backpack, a three-inch collar, a hanging scale, a container of dog supplements, several cellular telephones, and two guns. *Id.* at 26. Officer Smith testified that the hanging scale in the garage was similar to those he observed at other dog fighting locations. *Id.* at 22-23. He explained, "when two dogs fight they come up with a matched weight that both dogs have to come within. If one dog is over or under, you wind up forfeiting the fight. It is up to the two fighters to go on. You still lose your money. [The dogs] are weighed with a hanging scale." *Id.*

Officer Smith made in-court identifications of Taylor and the other co-defendants. On the day of the incident, he photographed each individual arrestee, including the contents of their pockets. *Id.* at 26, 29. In total, officers recovered almost $8,000.00 from Taylor and his co-defendants. *See id.* at 27-29. Taylor had a smaller amount of cash in his pockets. Munson had $5,238.00, which was placed on the floor in front of his wheelchair. *Id.* at 22, 29. Peterson had $2,160.00 in his pockets. *Id.* at 28. Parks had approximately $320.00 in his pockets. *Id.* at 27, 43. Easton was found inside of the building hiding behind a welding machine with cash in his pockets. *Id.* at 29, 32.

Officers found two other dogs in nearby vehicles. *Id.* at 31. Officers rescued an underweight, malnourished, and dehydrated dog from a minivan registered to Parks located a block and a half away from the garage. *Id.* at 31, 43. Officers executed a search warrant on a vehicle with out-of-state tags, wherein they found a puppy without food or water. *Id.* at 31-32.

At the conclusion of Officer Smith's testimony,[8] the Commonwealth rested. *See Id.* at 32. After brief argument, the municipal court dismissed the charges, stating there was a lack of evidence tying Taylor and his co-defendants to their respective charges. *Id.* at 55-56.

On June 15, 2018, the Commonwealth filed a notice of refiling against Taylor, together with his co-defendants Peterson, Easton, Munson, and Parks. Trial Court Opinion at 2. The Honorable Shanese I. Johnson ("trial court") presided over a second preliminary hearing at the Court of Common Pleas on July 17, 2018.[9] At this hearing, after incorporation of the June 5, 2018 notes

_____

[8] In several exchanges during Officer Smith's testimony, defense counsel objected on the basis of hearsay. The trial court consistently sustained these objections. Because we do not address this *infra*, we do not go into detail on the specific instances. However, we note that hearsay is admissible at a preliminary hearing, so long as the entire *prima facie* case is not established **exclusively** on hearsay. **Commonwealth v. McClelland**, 233 A.3d 717 (Pa. 2020) (interpreting the changes to Pa.R.Crim.P. 542(E)) (emphasis added).

[9] At the beginning of the hearing, Parks was present but his counsel was not. At some point, Parks' counsel arrived, whereupon the trial court addressed counsel's absence. Parks acknowledged his understanding of the situation and stated he wanted to proceed. N.T. Second Preliminary Hearing, 7/17/18,
*(Footnote Continued Next Page)*

of testimony and corresponding photographs into the record, the Commonwealth called Director Wilson to testify. Since 2009, Director Wilson worked for the Pennsylvania SPCA and she served as the Director of Humane Law Enforcement. N.T. Second Preliminary Hearing, 7/17/18, at 13, 14. In this position, her responsibilities involved "directing investigations, both plain clothed and uniform, providing approval for search warrants, providing approval for citation, criminal affidavits, [handling and processing evidence, writing protocols, and training for SPCA officers and other law enforcement personnel]." *Id.* at 14. She began her career sheltering animals in Maryland in 1998 and taking courses at Howard County Community College on animal welfare and animal control. *Id.* at 15. She moved to Pennsylvania in 2002, where she completed state-mandated training about animal violence procedures; maintained annual education requirements in addition to state-mandated requirements; trained on blood sports including animal fighting, dogfighting, and cock fighting; and coordinated with organizations including the Humane Society of the United States, the American Society for the Prevention of Cruelty to Animals, the United States Department of Agriculture, and the American Humane Association. *Id.* at 15-16. Director Wilson participated in "hundreds" of dogfighting investigations, three of which

_____

at 40-42. All defense counsel participated in cross-examination of the Commonwealth's witnesses at the preliminary hearing.

were in-progress dog fights. *Id.* at 22, 43-44. Notwithstanding, defense counsel objected to offering Director Wilson as an expert in addition to a fact witness. *See id.* at 16-22. The trial court permitted her to testify as a fact witness only.

Director Wilson testified that at 4:00 p.m. on March 10, 2018, she and other officers met at the SPCA, where she briefed the team and directed officers to different surveillance operation locations. *Id.* at 23-24. Director Wilson proceeded with another officer to a location where Officer Smith already began surveillance. *Id.* at 24. Director Wilson testified that Officer Smith communicated with her via text message. *Id.* Director Wilson then described the facility as "a combined location" with a doorway next to a garage bay which was located "down the block" from a bakery. *Id.* at 29. She testified that the area was relatively secluded, noting only one individual walking a dog during the entirety of her surveillance. *Id.* at 49-50.

Director Wilson responded to the location after receiving information from Officer Smith. *Id.* at 29. She noted "inside the property I heard the sounds of individuals cheering and the sounds of dog fighting. It's like this grunt sound that you hear when dogs are excited and fighting." *Id.* Director Wilson described the cheering as "more consistent with like a back and forth, similar to what you would hear at like a sporting event where . . . different people are cheering for different teams." *Id.* at 38. She knocked on the door, yelling "Police. SPCA." *Id.* at 29. While Director Wilson continued to knock,

the cheering persisted until she heard people saying "Shh. Shh[,]" saw the lights turn off from under the garage bay, and heard people moving around inside. *Id.* at 29-30. As she and another officer began kicking the door to enter the garage, she heard the garage bay door open and observed "a row of individuals standing at that doorway. And then those individuals begin to run out from the doorway." *Id.* at 30. Director Wilson testified that she tackled one individual to the ground, moved once another officer had control of the individual, and secured co-defendant Munson as he attempted to flee the garage in his wheelchair. *Id.*

> Director Wilson described the scene as follows:
>
> When you walk in the door of the garage bay - - so if you're at the garage bay[,] the door with the metal pulldown over top of it that makes it secure, that was up, but the door was still locked. So we then walk into the garage bay.
>
> And then on the right you have like - - I think it was two or three rows of motorcycles or dirt bikes. The big opening in front had a makeshift ring in it. Half of the ring had tipped over. The other half was still erect. And . . . there was a red [carpet] down underneath that makeshift ring.
>
> And then in the back corner was the bathroom where I had secured the dog. And then there was a flight of steps. And it had this balcony area, which I think was five to seven feet wide, not very wide. And there were workbenches across the back. So the property itself, you know, there was just the ring there.
>
> []You had the bikes and the workstation, but when you walk in you can see basically the entire first floor just upon walking in. And the space where you would normally see vehicles parked and that kind of thing was the dogfighting area.

*Id.* at 33-34.

Director Wilson testified that when she entered the garage, she "saw the two dogs locked on each other in the ring." *Id.* at 30. She described:

Both of them were bleeding. The black dog at the time had a better grip than . . . the tan dog . . . [T]hey both though had wounds across their legs.

They seemed to be more leg and face dogs, going for the front legs and the face of one another. And so they were latched on tearing at each other. And the first time I separated them, when it was just by myself without the other officers' assistance, they immediately went right back to latch on to one another.

*Id.* at 45. Director Wilson testified that the dogs were fighting on top of the carpet, which appeared to be a new red carpet but had "some wet marks that would be consistent with blood." *Id.* at 74, 75.

After Director Wilson and another officer successfully separated the two dogs, Director Wilson secured the black dog in the bathroom and the tan dog ran away. *Id.* at 30-31. Within the bathroom, she observed a five-or-ten-gallon bucket holding a substance consistent with milk mixed with something else. *Id.* at 38. She unequivocally testified that she found this substance at every dog fight she investigated.[10] *Id.* at 40.

After securing the black dog, Director Wilson searched for and retrieved the run-away tan dog. *Id.* at 30-31. Director Wilson observed the two dogs "had bite wounds across the face, chest, and leg areas. They started swelling fairly quickly. [She] then also saw them back at the shelter after a few hours.

---

[10] Defense counsel objected to Director Wilson testifying further about this substance on grounds that it was expert testimony. *See* N.T. Second Preliminary Hearing, 7/17/18, at 38-44.

And there - - there was bruising and swelling across the four limbs and face area." *Id.* at 46.

Director Wilson testified that she observed other officers moving individuals in handcuffs into the garage area as she embarked on retrieving the tan dog. *Id.* at 31-32. Upon her return, she and other officers "began processing the scene further" by obtaining identification from the individuals, including name and date of birth. *Id.* at 32. Pursuant to a search warrant, she documented all items recovered from these individuals on an inventory receipt and deposited all money into a bank account pending court determination. *Id.* at 32, 33. Director Wilson disclosed that she could identify none of defendants except Munson. From Munson's pocket, she recovered cash totaling "over $5,200[.00]," which was placed in front of his wheelchair. *Id.* at 32.

Director Wilson testified that she asked the individuals in custody whether they had any other dogs in vehicles, to which everyone replied "no." *Id.* at 46. Notwithstanding the denials, she found two more dogs. *Id.* One dog was located within a vehicle bearing a Virginia license plate and parked across the street from the garage. *Id.* Director Wilson found a "light tan dog" inside Parks' minivan held in a crate, with scarring across its legs, face, and ears and "a scab with like a little bit of bleeding around the ear." *Id.* at 47.

During her testimony, Director Wilson disclosed that she remained in the courtroom during Officer Smith's testimony in the first preliminary hearing

despite the sequestration order. *Id.* at 62. A discussion ensued wherein the trial court, after hearing argument from the Commonwealth and defense counsel, attempted to determine if a sequestration violation had occurred by considering the content of the municipal court's sequestration order.[11] *See id.* at 62-69. Ultimately, the trial court held its decision on the matter under advisement and allowed Director Wilson to finish her testimony. *Id.* at 68-69. All defense counsel had the opportunity to cross-examine Director Wilson and made further arguments on the record to the trial court on the issue of her alleged sequestration violation. *See generally id.* at 69-96.

On July 31, 2018 the trial court denied the Commonwealth's motion to refile and dismissed the charges against Taylor and all of his co-defendants. N.T. 7/31/18, at 8. The trial court explained:

---

[11] The Commonwealth argued that Director Wilson was not called at the first preliminary hearing and that the municipal court did not say "potential witnesses." N.T. Second Preliminary Hearing, 7/17/18, at 63, 67. Conversely, defense counsel argued that all witnesses were to be sequestered, Director Wilson was listed on the Commonwealth's potential witness list, sequestration is for any potential witnesses going forward, and that the second hearing before the trial court was "effectively the same hearing[as the first hearing before the municipal court]" because it is "part two of the two[-]part hearing." *Id.* at 63, 65, 66, 68, and 69.

The trial court noted its understanding that Director Wilson stayed in the room because she was not a witness on the day of the first preliminary hearing and its query into the Commonwealth's intent to call Director Wilson that day. *Id.* at 63, 66, and 67-68. The court also questioned the parties as to whether the municipal court's sequestration order was meant to extend to witnesses testifying "today" or "today or through the entire trial." *Id.* at 65.

- 14 -

I definitely had concerns about the sequestration issue with the - - with the fact witness that gave additional testimony. She was present during the [first preliminary hearing]. And I feel with the sequestration order that she should not have been present when . . . she should have been sequestered with everybody else at the [first preliminary hearing]. So, for that reason, and also having, obviously, read the notes and I listened to the additional testimony anyway, I still . . . deny the refile.

*Id.* at 8-9. The Commonwealth asked for clarification whether "having reviewed the initial preliminary hearing, [is the trial court] also saying that [the Commonwealth] didn't establish the *prima facie* case?" *Id.* at 12. The trial court responded, "I don't think enough so that I want to disturb the finding at the [m]unicipal [c]ourt level, yes." *Id.* This timely appeal followed.[12]

The Commonwealth raises the following issues on appeal:[13]

1. Did sufficient evidence support [Taylor's] charges of aggravated cruelty to animals, criminal conspiracy and animal fighting, where [Taylor] was apprehended at a dogfighting facility with cash in his possession?

---

[12] The Commonwealth filed a timely notice of appeal from the trial court's order. Commonwealth's Notice of Appeal, 8/2/18. Pursuant to Pa.R.A.P. 1925(b), on August 8, 2018, the trial court ordered the Commonwealth to file a statement of matters complained of on appeal, which the Commonwealth timely filed on August 27, 2018. The trial court issued its 1925(a) opinion on March 2, 2020.

[13] Appellee Taylor failed to file a brief in this appeal, therefore this Court precluded Taylor's counsel from participating in oral argument but nonetheless required counsel's presence to answer potential questions from the panel. *See* Superior Court Order, 2/12/21, at 3, *citing* Operating Procedures of the Superior Court, § 65.34.B.

- 15 -

2. Did the trial court err in excluding hearsay where hearsay is admissible at a preliminary hearing, and the alleged hearsay was in fact non-hearsay?

3. Did the trial court err in excluding the testimony of Nicole Wilson, where the violation of the court's sequestration was inadvertent and could not have altered Director Wilson's testimony, because she had participated in the animal cruelty investigation in concert with the other officers and therefore already knew what their testimony would be, and where the trial court's *post hoc* reasons for excluding the testimony was rebutted by the record?

Commonwealth's Brief at 4.

It is well-settled that the evidentiary sufficiency of the Commonwealth's *prima facie* case is a question of law to which this Court's review is plenary. ***Commonwealth v. Karetny***, 880 A.2d 505, 513 (Pa. 2005). The trial court is afforded no discretion in deciding whether, as a matter of law and in light of the facts presented to it, the Commonwealth has carried its burden to make out the elements of a charged crime. ***Id.***

As our Supreme Court explained:

[a]t the preliminary hearing stage of a criminal prosecution, the Commonwealth need not prove the defendant's guilt beyond a reasonable doubt, but rather, must merely put forth sufficient evidence to establish a *prima facie* case of guilt. A *prima facie* case exists when the Commonwealth produces evidence of each of the material elements of the crime charged and establishes probable cause to warrant the belief that the accused committed the offense. Furthermore, the evidence need only be such that, if presented at trial and accepted as true, the judge would be warranted in permitting the case to be decided by the jury.

***Id.*** at 513-514 (internal citations omitted). Weight and credibility of evidence are not factors at the preliminary hearing stage. ***Commonwealth v. Wojdak***, 466 A.2d 991, 997 (Pa. 1983). All evidence must be read in the

- 16 -

light most favorable to the Commonwealth, and inferences reasonably drawn therefrom which would support a verdict of guilty are to be given effect. ***Commonwealth v. Huggins***, 836 A.2d 862, 866 (Pa. 2003), *citing* ***Commonwealth v. Marti***, 779 A.2d 1177, 1180 (Pa. Super. 2001). Courts must employ a "more-likely-than-not" test to assess the reasonableness of inferences relied upon. ***Wojdak***, 466 A.2d at 996. Anything less amounts only to suspicion or conjecture. ***Id.*** Our Supreme Court recently reminded that the *prima facie* showing is a low threshold for the Commonwealth to surpass. ***See Commonwealth v. Perez***, 2021 WL 1703630 (Pa. Apr. 29, 2021).

The Commonwealth argues that the trial court erred in dismissing charges against Taylor and his co-defendants for lack of evidence. The Commonwealth asserts that even without the testimony of Director Wilson, as precluded by the trial court after the second preliminary hearing, it produced sufficient evidence to meet its burden of establishing a *prima facie* case for all three crimes charged – animal cruelty, conspiracy, and animal fighting. Moreover, the Commonwealth argues that because Taylor was charged with conspiracy, it did not have to offer evidence that Taylor personally harmed the dogs or owned the venue to charge him for the actions of his co-conspirators.

The trial court opined that the Commonwealth's evidence did not establish a *prima facie* case because it only produced evidence to establish that Taylor was present in the garage with at least $20.00 and arrested by an

unidentified non-testifying officer. Trial Court Opinion at 4. The trial court dismissed charges because "[t]his is not enough to establish that a crime was committed or that [Taylor] was the one that committed it." *Id.* at 5. We disagree with the trial court's analysis and conclusion.

We note initially that the trial court determined that the only facts established by the Commonwealth included Taylor's presence at the scene and possession of at least $20.00. *See* Trial Court Opinion at 4, 5. This narrow view of the evidentiary record erroneously ignored a plethora of facts and testimony offered by Officer Smith. Moreover, the trial court erred in failing to view the evidence in a light most favorable to the Commonwealth or making all reasonable inferences in its favor. Viewing the evidence under the proper standard, we conclude that the Commonwealth met its evidentiary burden at the preliminary hearing stage of these proceedings.

To establish a *prima facie* case of aggravated cruelty to animal-torture, the Commonwealth must provide sufficient evidence that a person intentionally or knowingly tortures an animal. 18 Pa.C.S.A. § 5534(a)(1). "Torture" is defined as:

> [a]ny of the following acts directed toward or against an animal unless directed to be performed by a licensed doctor of veterinary medicine acting within the normal scope of practice:
>
> > (1) [b]reaking, severing or severely impairing limbs[;]
> >
> > (2) [i]nflicting severe and prolonged pain from burning, crushing or wounding [; or]

- 18 -

(3) [c]ausing or allowing severe and prolonged pain through prolonged deprivation of food or sustenance without veterinary care.

18 Pa.C.S.A. § 5531. Animal fighting necessarily involves cruelty to animals and torture because it requires the animals to wound each other up to and including death of one of the participants.

Viewing the evidence in a light most favorable to the Commonwealth, the evidence was sufficient to demonstrate a *prima facie* case of aggravated cruelty to animals. Peterson and another individual brought dogs into a garage facility where officers later found a staged fighting ring and other evidence of dog fighting. Taylor took affirmative overt acts to enter the garage facility where this fighting activity occurred, namely entry into the facility through a doorman. A reasonable inference permits a finding that Taylor knew of the dog fight and intentionally attended the performance. Moreover, almost $8,000.00 was recovered from Taylor and his co-defendants, at least $20.00 from Taylor himself. The evidence supports a reasonable inference that Taylor brought cash with him to the garage to participate in, or wager on, a dogfight.

The Commonwealth offered sufficient proof that the dogs sustained sufficiently severe wounds to establish torture. Here, Officer Smith testified in detail that he discovered fresh puncture wounds in the face, chest, and leg areas of the dog brought into the garage by Peterson. The officer also observed similar wounds on another tan-and-white pit bull found inside the garage. Two other dogs were found within close proximity to the garage.

Mindful that a *prima facie* case is a low threshold, we conclude that the Commonwealth established the material elements of aggravated cruelty to animals – torture sufficient to hold the charge for trial.

To establish a *prima facie* case of conspiracy, the Commonwealth must provide sufficient evidence that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons; (2) with a shared criminal intent; and (3) an overt act was done in furtherance of the conspiracy. ***Commonwealth v. Dantzler***, 135 A.3d 1109, 1114 (Pa. Super. 2016). "The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished." ***Commonwealth v. Melvin***, 103 A.3d 1, 42 (Pa. Super. 2014) (internal citation omitted). Because an explicit or formal agreement to commit an unlawful act is difficult to prove, such an act may be proved inferentially by circumstantial evidence. ***Commonwealth v. Galindes***, 786 A.2d 1004, 1010 (Pa. Super. 2001), *citing* ***Commonwealth v. Spotz***, 756 A.2d 1139, 1162 (Pa. 2000). The agreement may be inferred from "a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." ***Commonwealth v. Feliciano***, 67 A.3d 19, 25-26 (Pa. Super. 2013) (*en banc*). Presence at the scene of the crime and participation in the object of the conspiracy are also relevant circumstances to consider. ***Commonwealth***

*v. Lambert*, 795 A.2d 1010, 1016 (Pa. Super. 2002). In a similar way, intent may be proved by direct evidence or inferred from circumstantial evidence. *Galindes*, 786 A.2d at 1009.

Viewing the evidence in a light most favorable to the Commonwealth, we find that the trial court committed an error of law in dismissing the charge of conspiracy. A court may reasonably infer an agreement from the circumstances surrounding the criminal episode. *Feliciano*, *supra*. Specifically, Peterson and another individual brought two dogs into a garage located in a secluded area. A doorman guarded admittance into the garage. Taylor needed to pass this doorman before entering the garage. When officers attempted entry, all individuals, including Taylor and his co-defendants, fled from or hid within the garage. Within the garage, wounded dogs and the accoutrements of dog fighting were found. Moreover, each of the alleged co-conspirators was found with various amounts of cash in their pockets, totaling almost $8,000.00. Based on these circumstances, it can reasonably be inferred that Taylor and his co-defendants agreed to meet at this location, a secluded and guarded venue unlikely to be visited or observed by passing individuals, to engage in the unlawful act of dog fighting.

The same facts support the inference of a shared criminal intent to engage in dog fighting. All individuals within the garage simultaneously terminated their activities and fled the scene or hid upon the officers' arrival. A collective criminal agreement with shared intent may be inferred where

multiple individuals simultaneously take flight from a secluded and enclosed venue upon the arrival of the police. ***Commonwealth v. Crawford***, 24 A.3d 396, 405 (Pa. Super. 2011)(citation omitted) (because intent is subjective, one looks to conduct and surrounding circumstances to determine mental state). Combined with the accoutrements of dog fighting found within the garage, the evidence permits an inference of an agreement with a shared criminal intent of participating in or witnessing a dog fight.

Lastly, multiple overt acts were performed in furtherance of this conspiracy. Officer Smith observed individuals bringing dogs into the garage. He observed individuals entering with a carpet and saw the same carpet underneath a makeshift dog fighting ring. All individuals within the garage, including Taylor, were affirmatively admitted through a doorman to participate or view the dog fight. The simultaneous termination of activity and flight from or hiding within the garage can reasonably be seen as overt acts of concealment of criminal activity. Therefore, the Commonwealth produced sufficient evidence to establish the *prima facie* case of conspiracy.

To establish a *prima facie* case of animal fighting, the Commonwealth must provide sufficient evidence that a person, for amusement or gain, causes, allows, or permits an animal to engage in animal fighting. 18 Pa.C.S.A. § 5543(1). Animal fighting may be found where there is evidence suggesting wounds to the subject animal's face, chest, legs, and eyes and where investigating officers find evidence of supplements, areas set up for the

fighting, and preparatory tools. ***Commonwealth v. Balog***, 672 A.2d 319, 322 (Pa. Super. 1996). Our Court interpreted "amusement or gain" to be engaging in animal fighting for "pleasurable diversion" or "advantage acquired or increased" whether for personal or pecuniary gain. ***Commonwealth v. Baumgartner***, 206 A.3d 11, 16-17, 20 (Pa. Super. 2019).[14]

Viewing the evidence in a light most favorable to the Commonwealth, we find that the trial court committed an error of law in dismissing the charge of animal fighting. Here, the evidence and its reasonable inferences are clear. A court can reasonably infer that Taylor and his co-defendants caused, allowed, or permitted the animal fighting because Peterson and other individuals brought multiple dogs into a secluded garage facility. Taylor and other individuals passed through a doorman to enter the garage, evidencing an intentional decision to attend the events unfolding within the venue. When officers attempted entry into the garage, all individuals within the garage attempted to flee from the scene or hid within the garage. Taylor and his co-defendants were apprehended either within the garage or on the nearby sidewalk.

---

[14] ***Baumgartner*** involved interpretation of a statute, 18 Pa.C.S.A. § 5511, which has since been repealed and replaced with the statute at issue in the present case. ***See Baumgartner***, 206 A.3d at 13 n.1 (§ 5534 replaced § 5511 effective August 28, 2017). Because the statutes are substantially similar, we continue to utilize our prior interpretation of the statutory text.

The evidence and the reasonable inferences therefrom also demonstrate that animal fighting occurred in the garage. Within the garage, Officer Smith observed dogs with fresh puncture wounds to the face, chest, and leg areas. Officer Smith, armed with years of experience in investigating animal fighting, testified these wounds were consistent with dogfighting. He also found accoutrements of dog fighting within the garage, including a makeshift ring with new carpet underneath; a mixture comprised of milk, Dawn dish soap, and rubbing alcohol; dog supplements; and a hanging scale. Officer Smith also linked the equipment recovered from the garage to the practice of staging dog fights.

The Commonwealth also made a *prima facie* showing that the animal fighting was for amusement or gain. Approximately 50 people entered a garage in a secluded area and they all fled or hid when officers announced themselves. Almost $8,000.00 in cash was recovered from Taylor and his co-defendants, suggesting a personal pecuniary interest in the event. Viewed in a light most favorable to the Commonwealth, the Commonwealth met its burden in establishing a *prima facie* case that Taylor and his co-conspirators caused and/or permitted animals to engage in animal fighting for his personal and/or pecuniary gain.

Because we determine that the Commonwealth met its *prima facie* burden on the testimony of Officer Smith alone, we do not reach the Commonwealth's second and third issues.

Order vacated. Case remanded. Jurisdiction relinquished.

President Judge Emeritus Stevens joins.

Judge Nichols notes dissent.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/20/2021