J-A27034-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KADRISE H. PATIENCE | : | No. 751 MDA 2024 |

Appeal from the Order Entered April 25, 2024
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0000282-2023

BEFORE: LAZARUS, P.J., KUNSELMAN, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:         **FILED APRIL 15, 2025**

The Commonwealth appeals from the order granting Kadrise H. Patience's pretrial petition for *habeas corpus* relief. The Commonwealth challenges the trial court's conclusion that the Commonwealth failed to present evidence linking Patience to the shooting death of Orlando Rodriguez ("the victim"). We reverse and remand for further proceedings.

The Commonwealth charged Patience with first and third-degree murder, conspiracy to commit first and third-degree murder, firearms not to be carried without a license, possession of a firearm prohibited, and two counts each of aggravated assault and conspiracy to commit aggravated assault.[1] The firearms charges were for Patience's alleged possession of a Glock 42 at the time of the murder. **See** Criminal Information, filed 2/14/23,

---

[1] 18 Pa.C.S.A. §§ 2502(a), (c), 903, 6106(a)(1), 6105(a)(1), 2702(a)(1), 2702(a)(4), and 903, respectively.

at Counts 9, 10. The Commonwealth charged a codefendant, Magnum Morrison, with the same offenses. *See* Docket No. CP-51-CR-0000283-2023.

The case proceeded to a preliminary hearing at which the Commonwealth presented the testimony of eight witnesses: Sergeant Scott Errington, Jr.; Crime Scene Unit Officer Wilfredo Ramirez; Criminal Investigator Timothy Morris; Parole Agent Chris Hall; Parole Agent Ryan Hess; Detective John McKeever; Officer Trevor Atkins; and Firearms Expert John Bradley Hoy. *See* N.T., Preliminary Hearing, 1/19/23 ("Prelim. Hrg."). The evidence relevant to this appeal was as follows.

Sergeant Errington arrived at 606 North 10th Street ("606 residence") in Reading, around 1 a.m. on June 17, 2021, in response to a call about a shooting on the same block as the 606 residence. *Id.* at 3, 4. When Sergeant Errington arrived at the scene, he met Krystle Castillo, who explained that the victim had called her and said that he had been shot. *Id.* at 4, 5. She provided her cell phone to police, and Sergeant Errington "performed a forensic extraction of the cell phone for all data and messages contained on it." *Id.* at 5, 6. The victim later died at the hospital. *Id.* at 38 (Commonwealth's Exhibit 2).

Officer Ramirez processed the scene for evidence, finding blood "outside the front sidew[al]k of the property," "some on the steps of the property" and "some blo[o]d in the vestibule leading towards the inside of the residence." *Id.* at 8, 9. He also found a "spent projectile" on the sidewalk "a couple feet" from the stairs of the residence. *Id.* at 9, 10. He recovered a bullet that he

described as a "spent 380 casing" inside the home on top of the kitchen counter, as well as marijuana he found in the basement. *Id.* at 9, 12. Castillo had "moved [the bullet] from the living room floor to the kitchen countertop." *Id.* at 81. There was no evidence of forced entry. *Id.* at 98.

Agent Hall testified that he had "supervised [co-defendant Morrison] as a parole agent from the middle of August to September and . . . met him the 1st time in person in September [2021]." *Id.* at 21, 22. He said that Morrison's phone number ended in 4289. *Id.* at 19, 20.

Agent Hess testified that he supervised Patience and that his phone number ended in 0376. *Id.* at 25, 37. Patience lived on Greenwich Street in Reading. *Id.* at 25.

Detective McKeever stated that he had viewed video surveillance from "a few house lengths" from the crime scene, 550 North 10th Street. *Id.* at 27, 29. Detective McKeever also viewed videos from "city owned cameras that usually pan around in different directions in various locations throughout the city[.]" *Id.* at 30.

Officer Atkins attended the victim's autopsy and reviewed the autopsy report, which identified the cause of death as multiple "gunshot wounds to the abdomen, right thigh, and right lower leg." *Id.* at 38, 39 (Commonwealth's Exhibit 3). The murder weapon was a "Glock 42, which is a [.380-]caliber weapon." *Id.* at 83. Officer Atkins learned from fellow officers that the victim's brother drove him to Reading Hospital after the shooting. *Id.* at 60, 61. When

the victim arrived at the hospital, he did not have his cell phone, and the police never recovered it. *Id.* at 61.

The Commonwealth also admitted video from cameras at three locations in Reading: 550 North 10th Street ("550 camera"), 10th and Greenwich Streets ("10th & Greenwich camera"), and 602 North 10th Street ("602 camera"). *Id.* at 37, 40; Commonwealth's Exhibit 4.[2]

Officer Atkins reviewed the videos in his testimony. On the footage, "[a] silver sedan, new model" appears on the video from 550 North 10th Street shortly after midnight on the night of the shooting.[3] N.T., Prelim. Hrg., at 35. Two males are seen getting out of the front and back seats of the passenger's side of the sedan and walking out of view. Commonwealth's Exhibit 4.[4] The males are then seen again moments later, walking together.[5] Officer Atkins said he prepared a still photograph from this footage. Agent Hall reviewed the photo and identified co-defendant Morrison as one of the men. *See* N.T., Prelim. Hrg., at 21, 37; Commonwealth's Exhibit 1; Commonwealth's Exhibit 4.[6] The other male was not identified. Morrison and the unidentified male go

---

[2] The footage from 602 North 10th Street was approximately one hour and three minutes behind. *See* N.T., Prelim. Hrg., at 42-43.

[3] 550 camera, timestamp 12:10:25 a.m.

[4] 550 camera, timestamp 12:20:37-12:21:00 a.m.

[5] 10th & Greenwich camera, timestamp 12:21:18 a.m.

[6] 10th & Greenwich camera, timestamp 12:21:19 a.m.

to the 606 residence. **See** Commonwealth's Exhibit 4.[7] Two more men then get out of the silver sedan and also walk to the 606 residence. **Id.** [8]

Two males then run from the 606 residence. **Id**.[9] They run to the silver sedan, which drives in reverse and stops in front of the 606 residence. **Id.**[10] Two more unidentified men then run from the 606 residence, one of whom is seen entering the silver sedan. **Id.**[11] The vehicle drives away and appears on surveillance footage a block away. **Id.**[12] Officer Atkins was unable to determine the license plate number of the silver sedan on the video footage. N.T., Prelim. Hrg., at 43.

During his investigation, Officer Atkins learned that Patience owned a silver 2017 Ford Fusion. **Id.** at 62. He further learned that license plate recognition cameras captured Patience's vehicle in Reading on June 16, 2021, at 5:37 p.m. and on June 17, 2021, at 8:32 p.m. **Id.** at 63-64, 65-66. Police also conducted a traffic stop of Patience's vehicle in August 2021, and

_____

[7] 10th & Greenwich camera, timestamp 12:21:50 a.m.

[8] 550 camera and 602 camera, timestamp 12:22:47 a.m., 12:23:16 a.m.

[9] 602 camera, timestamp 12:23:01 a.m.

[10] 602 camera, timestamp 12:23:42-12:23:55 a.m.; 550 camera, timestamp 12:24:05-12:24:28 a.m.

[11] 602 camera, timestamp 12:24:31 a.m., 12:24:38 a.m.; 10th & Greenwich camera, timestamp 12:25:33 a.m..

[12] 550 camera, 12:25:43 a.m.

recovered a "40 caliber Glock" unrelated to the murder. *Id.* at 80, 83. Patience was driving at the time. *Id.* at 80.

Officer Atkins obtained cell phone subscriber information for Morrison's, Patience's, and the victim's phones. Morrison and the victim were the listed subscribers for their phones, while Patience's mother, Sherry Rose, was the subscriber for Patience's phone. *Id.* at 46. The Commonwealth admitted Patience's phone records into evidence. Commonwealth's Exhibit 6.[13]

The prosecution also introduced Officer Atkins' notes based on Patience's call-dial records. N.T., Prelim. Hrg., at 50-51; Commonwealth's Exhibit 7. These notes showed calls between Patience and the victim's phone. N.T., Prelim. Hrg., at 51. Officer Atkins stated that the earliest call he found was from the afternoon before the killing, at 2:46 p.m. The last he found was from near the time of the shooting, at 12:13 a.m. *Id.* at 52. Officer Atkins also reviewed his notes for the records of calls between Patience's and Morrison's phones. *Id.* at 52, 53; Commonwealth's Exhibit 8. He explained that there were "approximately 10 calls exchanged prior to the homicide" between the two. N.T., Prelim. Hrg., at 53. After the homicide, Morrison called Patience approximately two hours after the shooting, at 2:25 a.m. *Id.* at 54; Commonwealth's Exhibit 8.

Using a program called CellHawk, Officer Atkins reviewed tower location and tower data for the victim's, Patience's, and Morrison's cell phones. N.T.,

---

[13] According to Officer Atkins, the recorded times were four hours behind. **See** N.T., Prelim. Hrg., at 47, 51.

Prelim. Hrg., at 48. He explained that "[f]or each call [CellHawk] will provide the coordinates info for the tower that the cell phone connects to, which tower at that time." *Id.* at 49. The Commonwealth introduced the CellHawk reports for Morrison, Patience and the victim. *See* Commonwealth's Exhibits 10 and 11.

Officer Atkins testified that by using CellHawk, he learned that "around the time of the shooting," Morrison's and Patience's cell phones "pinged off a tower" near the shooting. N.T., Prelim. Hrg., at 49, 50. He testified that Patience's and Morrison's phones pinged off a tower about one block from the 606 residence, at 505 North 10th Street ("the 505 tower"), at 12:06 a.m. *Id.* at 57, 59. Near the same time, at 12:10 a.m., Patience called the victim, at which time Patience's and Morrison's phones pinged off the 505 tower. *Id.* at 58, 59. One minute later, Morrison's phone pinged approximately one block away from the crime scene. *Id.* at 59. Within a few minutes, at 12:13 a.m., Patience called the victim again and Patience's phone again pinged off the 505 tower. *Id.* Approximately five minutes before the victim called Castillo to tell her that he had been shot, Patience's phone again pinged off the same tower. *Id.* Around this time, the victim's phone pinged off the tower about a block from the 606 residence – the same tower that Morrison's and Patience's phones had pinged. *Id.* At the time the victim called Castillo, Morrison's phone pinged off the 505 tower. *Id.*

Officer Atkins also reviewed data collected from GeoFence via Google, showing that Morrison's phone "was in the area [of 606 N. 20th Street] at

approximately 12:10 a.m." and left the area around the same time that the victim called Castillo. *Id.* at 68-71, 73.

Officer Atkins also testified that after the shooting, the victim's phone – which the victim did not have when he arrived at the hospital, and which police never recovered – pinged at a location that Officer Atkins testified was not en route to Reading Hospital. *Id.* at 60, 61. Patience's phone pinged to the same tower at 1:36 a.m. *Id.*

Officer Atkins agreed that Patience's address on Greenwich Street was approximately "within a minute or [two] walk from the area where the cell tower was that [Patience's] phone was pinging off" and could be "[c]onsistent with [Patience] being at his residence during that time[.]" *Id.* at 84. He further agreed that "a cell phone may not necessarily be pinging off of the tower which is geographically the closest to it at a particular time" and that variables such as "the amount of cell phone traffic in that vicinity and other things, buildings, obstructions . . ." may affect the information. *Id.* at 85.

The parties stipulated that a Glock 42 was recovered almost one year after the murder in the car of an individual unrelated to the case, and that two still photographs were uploaded to the Snapchat account of the mother of Patience's child, two months after the murder. *See id.* at 82, 99-100. In both photographs a male is pictured holding a gun with a clear extended magazine. *See* Commonwealth's Exhibits 18 and 19 (Snapchat photographs).

Firearms and tool mark expert John Hoy testified that he examined the cartridge and bullet recovered from the 606 residence as well as the Glock 42.

*Id.* at 101, 104-05; Commonwealth's Exhibit 17 (photograph of Glock 42). Hoy determined that the "cartridge case I examined . . . was discharged" from the Glock 42. N.T., Prelim. Hrg., at 105. He also determined that "[t]he discharged bullet" recovered from the home "was consistent with that [Glock 42]. However, in looking for individual characteristics [Hoy] was not able to make the determination as to whether or not it was discharged from that firearm." *Id.* He explained that because of this, his finding was inconclusive. *Id.* at 105, 106. Hoy testified,

> Well, the bullet itself which is consistent with the cartridge case that I received, the cartridge case is made by Tula Ammunition, it's a Russian made or Russian company. It's 380 auto, the problem for the discharged bullet is that at least in terms of comparisons that I did is that it has a metal jacket, most bullets that you'll find will have a copper jacket, these have a soft metal jacket which is condu[c]ive to picking out the individual characteristic[]s that I use for identification purposes in comparing a bullet to test firing from a firearm.
>
> In this particular case my finding was inconclusive, I could not identify the discharged bull[et] as having been discharged from that firearm; it's the same class, however again the finding is inconclusive.

*Id.* at 106.

Hoy testified that the firearm in the Snapchat photographs "appears to be consistent" with the firearm he examined but he could not say that the firearm was the same. *Id.* at 107. He explained that "based on the image of the object," the firearm appeared "consistent in the basic outline of the firearm that I examined and it also is an extended magazine which was somewhat unique." *Id.* He also explained that the magazine pictured in the photographs

was consistent with the firearm he examined. He described the magazine as "translucent, you can see through it, it's made out of clear plastic and in the images it's consistent in terms of the basic size of the magazine, it extends from the butt of the firearm out." *Id.* The Commonwealth admitted Hoy's firearms reports into evidence. *See* Commonwealth's Exhibits 21 and 22 ("Firearms Reports"). Neither Patience nor Morrison have licenses to carry a firearm, and both are persons prohibited to possess a firearm. N.T., Prelim. Hrg., at 81. The court bound the charges over.

Patience filed a pretrial motion that included a request for a writ of *habeas corpus*. He argued that other than the cellphone ping data, there was no evidence that he was at the scene of the murder. Amended Omnibus Pretrial Motion, filed 10/20/23, at ¶ 29. He also claimed that there was no evidence identifying him as the shooter, noting that the Commonwealth did not have the firearm used in the murder. *See id.* at ¶¶ 31, 33. The court held a hearing on the petition where the Commonwealth admitted into evidence the preliminary hearing transcript and exhibits, and presented additional testimony from the firearms expert.

Hoy explained that his comparison between the bullet from the scene and the firearm he examined was inconclusive because "it was insufficient in the individual characteristics that I use for identification purposes on the bullet." N.T., Omnibus Pretrial Motion Hearing, 11/20/23, at 18. Though he could not conclusively say that the bullet came from the firearm he examined, Hoy testified that the manufacturer and firing pins were consistent. *See id.* at

19. Hoy also testified that the silhouette of the firearm pictured in the Snapchat photographs was "consistent with the pistol I examined in my opinion, which was a Glock 42 .380" and "seems more consistent with a 42 than it would be with the [Glock] 23." *Id.* at 27. Hoy agreed that he could not say that the firearm pictured in one of the photographs was the same gun that he examined. *Id.* at 32.

The court granted Patience's petition for a writ of *habeas corpus*. **See** Order, filed 4/25/24. The court determined that "[e]ven in a light most favorable to the Commonwealth, the evidence did not make a *prima facie* case that Mr. Patience committed the crimes with which he is charged." *Id.* at 1 n.1. It explained its reasoning as follows:

> There were no identifications made that placed Mr. Patience at the scene. The cell phone pings and tower dumps put Mr. Patience's *cell phone* at a location near the scene but that does not prove that Mr. Patience was near the scene, especially in light of the evidence that Mr. Patience lived nearby. There was no evidence presented that the snapchat video of presumably (albeit never identified) Mr. Patience holding a gun was in fact the murder weapon. Instead, Mr. Hoy testified that it had similar characteristics, but he could not say for certain they were the same gun.

*Id.* (emphasis in original). The court discharged Patience's case, and this timely appeal followed. **See** Discharge Authorization, filed 4/26/24; **Commonwealth v. Merced**, 265 A.3d 786, 790 (Pa.Super. 2021) ("the Commonwealth may appeal from a trial court's order dismissing a felony charge based on a pretrial petition for Writ of *Habeas Corpus*") (citation omitted).

- 11 -

The Commonwealth raises the following issue:

> Did the trial court err in granting Kadrise Patience's motion for a writ of *habeas corpus* as to all counts by not evaluating the totality of the evidence presented linking Patience to the murder of [the victim] in the light most favorable to the Commonwealth as required by law?

Commonwealth's Br. at 4 (capitalization regularized; answer of trial court and suggested answer omitted).

We "review a grant or denial of a petition for Writ of *Habeas Corpus* for abuse of discretion, but for questions of law, our standard of review is *de novo*, and our scope of review is plenary." **Merced**, 265 A.3d at 792 (quoting **Commonwealth v. McClelland**, 233 A.3d 717, 732 (Pa. 2020)). When reviewing the grant of a petition for writ of *habeas corpus*, "we must generally consider whether the record supports the trial court's findings, and whether the inferences and legal conclusions drawn from those findings are free from error." **Commonwealth v. Hilliard**, 172 A.3d 5, 10 (Pa.Super. 2017) (citation omitted). "When deciding whether a *prima facie* case was established, we must view the evidence in the light most favorable to the Commonwealth, and we are to consider all reasonable inferences based on that evidence which could support a guilty verdict." **Commonwealth v. Lees**, 135 A.3d 185, 188 (Pa.Super. 2016) (citation omitted).

The Commonwealth argues that the court failed to view the evidence in the light most favorable to it and ignored circumstantial evidence. It notes that Patience's phone and the victim's phone had a ping match after the murder, the firearms expert testified that the gun pictured in the Snapchat

video looked like the Glock 42 that he examined, and a cartridge found at the murder scene matched the Glock 42 that the firearms expert examined. The Commonwealth maintains that based on this circumstantial evidence, it presented a *prima facie* case "that Patience was involved with the murder of [the victim]." Commonwealth's Br. at 26. It further claims that even if Patience was merely at the murder scene, his phone was traveling with the victim's phone, which by that time was no longer with the victim. It claims that this evidence suggests that "Patience was at best directly involved in the murder and at worst an accomplice both before and after the fact." *Id.* at 25.

"A pre-trial *habeas corpus* motion is the proper means for testing whether the Commonwealth has sufficient evidence to establish a *prima facie* case." **Commonwealth v. Carper**, 172 A.3d 613, 620 (Pa.Super. 2017) (citation omitted). "[A] *prima facie* case exists when the Commonwealth produces evidence of each of the material elements of the crime charged and establishes probable cause to warrant the belief that the accused committed the offense." **Commonwealth v. Newton**, 318 A.3d 133, 139 (Pa.Super. 2024) (quoting **Commonwealth v. Perez**, 249 A.3d 1092, 1102 (Pa. 2021)). "The weight and credibility of the evidence is not a factor at this stage." **Hilliard**, 172 A.3d at 10 (alteration in original and citation omitted). Nor is the Commonwealth required to establish the defendant's guilt beyond a reasonable doubt at this stage. **Lees**, 135 A.3d at 188. "The evidence need only be such that, if presented at trial and accepted as true, the judge would

be warranted in permitting the case to go to the jury." ***Commonwealth v. Huggins***, 836 A.2d 862, 866 (Pa. 2003).

In its determination that the Commonwealth did not meet its burden, the trial court addressed the first-degree and third-degree murder charges. ***See*** Pa.R.A.P. 1925(a) Opinion, filed 7/19/24, at 5 (noting that the Commonwealth charged Patience with first-degree and third-degree murder). The court concluded that the Commonwealth "properly established the statutory elements of the crime of murder at the *prima facie* level" but did not prove that Patience was at the scene or that he "killed another person with the specific intent to kill that person and with malice aforethought." ***Id.*** at 6, 8. The court noted that the only evidence connecting Patience to the crime included cell phone pings and tower dumps from Patience's cell phone putting him near the scene. ***See id.*** However, the court concluded that the cell phone evidence merely placed Patience's "cell phone at the location near the murder" but not Patience himself. ***Id.*** The court additionally noted that Patience's cell phone was registered to his mother. The court did not explain why it believed the Commonwealth failed to present *prima facie* evidence for the remaining charges.

As stated earlier, the Commonwealth charged Patience with first and third-degree murder, conspiracy to commit first and third-degree murder, two counts of aggravated assault, two counts of conspiracy to commit aggravated assault, firearms not to be carried without a license, and possession of a firearm prohibited.

- 14 -

**First-Degree and Third-Degree Murder and Conspiracy**

It is without question that the victim died from multiple gunshot wounds. However, the court determined that there was no *prima facie* evidence that Patience was responsible for the killing, acted with malice, or had a specific intent to kill. We disagree, considering that the Commonwealth charged Patience with conspiracy.

To establish a *prima facie* case for a charge of conspiracy, "the Commonwealth must provide sufficient evidence that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons; (2) with a shared criminal intent; and (3) an overt act was done in furtherance of the conspiracy." **Commonwealth v. Munson**, 261 A.3d 530, 542 (Pa.Super. 2021). An overt act "may be proved inferentially by circumstantial evidence" including "the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." **Id.** (quoting **Commonwealth v. Feliciano**, 67 A.3d 19, 25-26 (Pa.Super. 2013) (*en banc*)).

In view of the cell phone tower data, the surveillance footage, the communications between Patience and Morrison, as well as Patience's calls to the victim on the day of the shooting, the evidence is sufficient to make out circumstantially a *prima facie* case of Patience's involvement in the conspiracy to commit aggravated assault and murder. The four individuals viewed on the surveillance arrived near the area of the homicide together and left the scene

- 15 -

of the homicide together, showing a shared intent. Cell phone tower data showed that Patience was near the scene and in communication with at least one individual identified at the scene, co-defendant Morrison. Furthermore, although the Glock 42 examined by Hoy is not directly linked to Patience, Hoy testified that the firearm he examined was consistent with the firearm in the Snapchat photographs. As the trial court aptly pointed out, the Commonwealth did not identify the male in the Snapchat photographs. Nonetheless, viewing the evidence in the light most favorable to the Commonwealth and drawing all reasonable inferences in its favor, there is a reasonable inference that the male depicted in the photograph is Patience considering that they were uploaded from an account belonging to the mother of his child.

Furthermore, Patience called the victim three times before the shooting and cell data placed him in the area of the homicide around the time of the shooting. After the shooting, the victim's phone and Patience's phone pinged from the same tower location, despite the victim being at Reading Hospital at the time. Two months after the murder, a male was pictured with a firearm that looked similar to the murder weapon, which Officer Atkins testified was a Glock 42. Hoy examined a Glock 42 and a cartridge recovered from the scene. He determined that the cartridge was consistent with the firearm but could not say that the bullet recovered from the scene was discharged from the firearm. Hoy also examined two photographs showing a male holding what appears to be a firearm and noted that it appeared consistent with the Glock

he examined. Specifically, he noted features of the firearm such as an extended translucent magazine and the overall shape of the gun were like the firearm that he examined.

The evidence viewed in the light most favorable to the Commonwealth would suggest that Patience entered into an agreement with Morrison to shoot the victim, resulting in his death. Moreover, the facts that Patience's phone is registered to his mother and he lived near the scene of the crime go to the weight of the evidence, which is irrelevant at this stage. **Hilliard**, 172 A.3d at 10.

To the extent that the court also determined that the Commonwealth failed to establish *prima facie* evidence of the remaining charges, it did not explain its reasoning for this conclusion. Specifically, the court did not discuss what elements the Commonwealth failed to establish for the remaining charges. Nonetheless, we address the remaining charges since the court's order dismissed all charges.

**Aggravated Assault**

The Crimes Code defines aggravated assault as follows:

> **(a) Offense defined.**--A person is guilty of aggravated assault if he:
>
> (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; [or]
>
> ***

(4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon[.]

18 Pa.C.S.A. § 2702(a)(1), (4).

Considering that the victim in this case died from multiple gunshot wounds, the element of attempting to cause serious bodily injury is satisfied as well as attempting to cause serious bodily injury with a deadly weapon, *i.e.*, a firearm. The evidence viewed in the light most favorable to the Commonwealth in light of the charge of conspiracy establishes that Patience entered into an agreement with Morrison to shoot the victim, resulting in his death.

**Firearms Violations**

Section 6105 of the Uniform Firearms Act provides that:

**(a) Offense defined.**--

(1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

18 Pa.C.S.A. § 6105(a)(1). Section 6106 of the same Act provides that a person may not carry "a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license[.]" ***Id.*** at § 6106(a)(1).

Viewing the evidence in the light most favorable to the Commonwealth, and considering all reasonable inferences based on that evidence, the Commonwealth presented a *prima facie* case. There is no dispute amongst the parties that Patience does not have a license to carry a firearm and is prohibited from possessing a firearm. Hoy examined a Glock 42 and determined that the projectile recovered from the scene matched the firearm. The Commonwealth introduced two photographs of a male holding what appeared to be a firearm with a clear extended magazine. Though Hoy could not testify that it was the exact gun used in the homicide, he cited multiple aspects of the gun that led him to believe that it was consistent with the firearm he examined including the shape of the gun and the extended translucent magazine. As previously stated, though the Commonwealth did not identify the male in the photograph, there is a reasonable inference that the male depicted in the photograph is Patience, holding a firearm that looked similar to the murder weapon.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/15/2025