J-A16033-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NATHANIEL WILLIAMS | : | No. 980 EDA 2021 |

Appeal from the Order Entered April 22, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): MC-51-CR-0030428-2019

BEFORE: McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

DISSENTING MEMORANDUM BY PELLEGRINI, J.:**FILED NOVEMBER 03, 2022**

I respectfully dissent from the majority's decision to affirm the trial court's determination that the Commonwealth did not present sufficient evidence to hold over for court a former police officer, Nathaniel Williams, on one count each of unsworn falsification (18 Pa.C.S. § 4904(a)); fabricating physical evidence (18 Pa.C.S. § 4910); tampering with public records (tier-3 felony) (18 Pa.C.S. § 4911); and obstructing administration of law or other governmental function (18 Pa.C.S. § 5101).

At a preliminary hearing, the Commonwealth only has to present a *prima facie* case as to a defendant's guilt of the charged crimes. There is undisputed

_____

[*] Retired Senior Judge assigned to the Superior Court.

evidence here that, while employed as a detective in the Philadelphia Police Department, Nathaniel Williams (a) used police databases to look up a woman's personal information at the behest of his cousin, enabling his cousin to then stalk that woman; (b) lied to an internal affairs investigator about having no contact with his cousin; (c) concocted an implausible justification for using the police databases, implicating the stalking victim as a person of interest in a murder investigation; and (d) altered a homicide investigation file in an effort to thwart the inquiry into this conduct.

By nevertheless affirming the trial court's ruling, the majority has departed from well-settled law and imposed on the Commonwealth a more stringent test for establishing a *prima facie* case. Under the majority's rationale, the Commonwealth is required to disprove or rebut interpretations of the evidence that favor the defendant, even where the evidence presented allows a reasonable inference of guilt and the defendant's interpretation is uncorroborated. For the reasons below, I would find that the evidence was more than sufficient as a matter of law as to all four charged offenses which the Commonwealth seeks to hold over for court.

## I.

### A.

I will begin by summarizing the underlying material facts which are critical to our review. On October 14, 2017, at about 12:00 p.m., Theresa Williams was in a parking lot with her children. While she was preparing to

leave, Ms. Williams was approached by Edwin Williams, who she had never met before.[1]  Edwin Williams asked for Ms. Williams' phone number,[2] but she declined.  Nevertheless, about one or two weeks after that encounter, Ms. Williams was alarmed to find Edwin Williams knocking on the front door of her house.  She asked how he had learned her address and Edwin Williams did not give her an explanation.

When Edwin Williams appeared reluctant to leave Ms. Williams' home, she attempted to gather his personal information.  Ms. Williams asked him to write down his phone number and he did so.  During their conversation, she also learned that Edwin Williams worked for the Southeastern Pennsylvania Transportation Authority (SEPTA).

In the next few weeks, Edwin Williams continued contacting Ms. Williams indirectly by leaving her gifts such as flowers or greeting cards on her vehicle. Ms. Williams reported this conduct to SEPTA and the Philadelphia Police Department.   The Internal Affairs Division of the Philadelphia Police Department then assigned Lieutenant James Clough to investigate.

**B.**

---

[1] Edwin Williams was charged as a co-defendant, but the allegations against him are not at issue in the present appeal.

[2] Despite sharing the same surname, Ms. Williams and Edwin Williams are not related.

On November 7, 2017, Lieutenant Clough began his investigation by auditing police databases to determine whether they had recently been used to access Ms. Williams' personal information. These systems included the National Crime Information Center (NCIC), the Police Crime Information Center (PCIC), and the Pennsylvania Justice Network (JNET).

Lieutenant Clough discovered that three days after she was first accosted by Edwin Williams in a parking lot, on October 17, 2017, the Police Payroll Number belonging to Nathaniel Williams had been used to access the above databases and make inquires relating specifically to Ms. Williams. Moreover, Lieutenant Clough found that on that *same date*, October 17, 2017, Nathaniel Williams and Edwin Williams had exchanged a series of text messages between 3:00 p.m. and 3:15 p.m.

The timing of the messages between the two men was significant because they were sent *less than a half hour before* Nathaniel Williams first queried Ms. Williams on JNET. Nathaniel Williams also used NCIC and PCIC to search for more information about Ms. Williams later that day. Nathaniel Williams and Edwin Williams continued exchanging messages and phone calls from October 17, 2017, until November 5, 2017.

Lieutenant Clough interviewed Edwin Williams on November 24, 2017. During the questioning, Edwin Williams denied receiving information about Ms. Williams from a police officer, and he specifically stated that he did not know Nathaniel Williams. However, later that *same day*, Nathaniel Williams

replaced the personal cell phone he had been using to communicate with his cousin in the preceding months.

Nathaniel Williams was then interviewed by Lieutenant Clough on December 27, 2017. This interview was done orally, but the questions and answers were reduced to a written statement and signed by Nathaniel Williams. *See* Preliminary Hearing Transcript, 12/27/2017, at p. 29.

## C.

On November 21, 2019, Nathaniel Williams was charged with one count of tampering with records, one count of tampering with evidence, four counts of unsworn falsification to authorities, and obstruction of administration of law/other governmental function. These charges were all dismissed following a preliminary hearing on September 11, 2020, on the ground that the Commonwealth had not carried its burden of presenting enough evidence to establish a *prima facie* case that Nathaniel Williams had committed the offenses.

The Commonwealth moved to refile its complaint on September 17, 2020. This time, the charges included one count each of unsworn falsification (18 Pa.C.S. § 4904(a)); fabricating physical evidence (18 Pa.C.S. § 4910); tampering with public records (tier-3 felony) (18 Pa.C.S. § 4911); and obstructing administration of law or other governmental function (18 Pa.C.S. § 5101). A second preliminary hearing was held on April 22, 2021.

At the second hearing, the Commonwealth was for the first time permitted to read into evidence the transcribed questions and answers given during Lieutenant Clough's interview of Nathaniel Williams. *See* Hearing Transcript, 4/22/2021, at pp. 29-45.[3] It was undisputed that the transcribed interview was signed by Nathaniel Williams on all six pages of the transcription, and that he had signed the document in the presence of Lieutenant Clough. The very end of the transcribed statement included the clause, "I have read the foregoing statement consisting of six pages and it is true and correct to the best of my knowledge." *Id.* at pp. 44-45.

In the interview, Nathaniel Williams denied that he had allowed anyone else to login with his credentials to search the license plate number of Ms. Williams' vehicle or look up any other information about her. Nathaniel Williams claimed that he ran the searches himself only because he had then suspected that Ms. Williams was somehow involved in a homicide he had been investigating for about three months. Specifically, Nathaniel Williams stated that on October 16, 2017, he saw a murder suspect entering a white SUV or van, and a day later, Nathaniel Williams saw what he thought was the same vehicle parked near the suspect's home, learning after looking up its license plate number that it belonged to Ms. Williams:

---

[3] The trial court had precluded the admission of the written statement at the first preliminary hearing held on September 11, 2020.

- 6 -

> I saw the target of my investigation[,] Tashaun Curtis[,] get into a car a couple of months ago on the 6600 block of Ogontz right in front of his house. I was driving by. I saw him get into a white or white-colored SUV or van, and I drove around the block and the car was gone. A day later [on October 17, 2017,] I surveyed the neighborhood, and I saw a vehicle that I thought he had gotten into. I ran that tag.

*Id.* at p. 35.[4]

Nathaniel Williams admitted that Edwin Williams was his cousin, but he claimed that he had not "spoken" to him for "maybe a year or more" and that he had not given him any of Ms. Williams' personal information. *Id.* at p. 36. Nathaniel Williams claimed to be completely unaware of any of Edwin Williams' conduct toward Ms. Williams. *See id.* at p. 40.

It is worth mentioning here that Nathaniel Williams' responses to Lieutenant Clough were inconsistent with phone records demonstrating substantial communications between Nathaniel Williams and Edwin Williams at the relevant times. In the preceding year, the two men had exchanged over 20 recorded phone calls and over 100 text messages. This regular contact abruptly ceased at nearly the precise moment when Lieutenant

---

[4] The shooting occurred on July 31, 2017, and the decedent succumbed to his wound on August 1, 2017. The subject database searches were performed on October 17, 2017. Nathaniel Williams' interview with Lieutenant Clough took place on December 27, 2017. There is no corroboration in the record for Nathaniel Williams' claim that he ever saw a murder suspect, Tashaun Curtis, enter a white van which he suspected belonged to Ms. Williams.

Clough's investigation began. **See** Preliminary Hearing Transcript, 9/11/2020, at pp. 86-88.

After Lieutenant Clough had interviewed Nathaniel Williams, he began attempting to verify the explanation given for his inquiries as to Ms. Williams. To that end, he contacted Nathaniel Williams' superior officer so that he could obtain a copy of the police department's "homicide file" concerning the subject murder in Ms. Williams' neighborhood. Lieutenant Clough went to the Homicide Division Unit and obtained the homicide file relating to the murder investigation referred to by Nathaniel Williams. The file was marked with the numerical designation, "M17-185," and it contained not a single reference to Ms. Williams. **See id**. at pp. 77-78.

However, the next day, Lieutenant Clough learned from a colleague in Internal Affairs that Nathaniel Williams had contacted him to supplement the homicide file with additional documentation. Nathaniel Williams produced a second folder containing, among other things, a photograph of Ms. Williams and her family which had been printed from her publicly accessible Facebook account. On the back of the photograph were some handwritten notes concerning Ms. Williams' personal information and the license plate number of her vehicle. **See id**. at pp. 77-80. No explanation has been given as to why this information was written on the back of a photo rather than printed directly from a database.

Lieutenant Clough testified that the printout of the Facebook photo differed from the form and content of documented searches of other individuals in the homicide file, suggesting to him that Nathaniel Williams only added the printout to the file to make it appear as if his inquiry into Ms. Williams was part of a legitimate homicide investigation.[5]

At the conclusion of the hearing held on April 22, 2021, the trial court denied the Commonwealth's motion to refile its complaint. The Commonwealth timely appealed, and the trial court entered an opinion giving its reasons why the order should be affirmed. *See* Trial Court Opinion, 10/18/2021. As to the charge of unsworn falsification, the trial court found that the Commonwealth failed to establish a *prima facie* case because no evidence was introduced showing that Nathaniel Williams acted with intent to mislead or deter Lieutenant Clough during his investigation.

As to the charge of tampering with or fabricating physical evidence, the trial court found that there was no evidence that Williams had altered, destroyed, concealed or removed a government record with the intent to thwart a proceeding or investigation. As to the count of tampering with public

_____

[5] Lieutenant Clough stated in an affidavit for an arrest warrant that the subject homicide file "contained no computerized print outs or 'workups' of Theresa Williams inside. The activity sheets for M17-185 also do not include any documentation of the alleged sighting of Tashaun Curtis getting into a car in the area of [Ms. Williams' neighborhood]." Affidavit for Arrest Warrant, 11/18/2019, at 3.

records or information, the trial court reasoned only that the evidence was insufficient, and that the statute was not intended to criminalize Nathaniel Williams' conduct. Finally, as to count of obstruction of the administration of law or other governmental function, the trial court found that a *prima facie* case had not been established by the Commonwealth. *Id.* at 9-10.

The Commonwealth now argues that the trial court erred as a matter of law in ruling that the evidence was insufficient to establish a *prima facie* case on all four counts. *See* Appellant's Brief, at 4. The Commonwealth contends that it carried its burden at the preliminary hearing because, when accepted as true and viewed in the light most favorable to the prosecution, the evidence satisfies the elements of each of the four charged crimes.[6]

## II.

The majority overlooks key components of what constitutes a *prima facie* case at the preliminary hearing stage resulting in an erroneous disposition. I would, therefore, expand on the majority's summary of law with the following points of emphasis that should guide our determination.

---

[6] An order denying the refiling of charges is final and immediately reviewable. The charges against Nathaniel Williams in this case were initially dismissed following a preliminary hearing before the Honorable William Austin Meehan, Jr. on September 11, 2020. The Commonwealth then moved to refile the complaint, but the successor judge, the Honorable Crystal Bryant-Powell, denied the refiling of the charges after a second hearing. This was a final and appealable order because the Commonwealth had unsuccessfully sought to refile the charges pursuant to Pa.R.Crim.P. 520(H), and an appeal from the order denying refiling was the Commonwealth's only recourse.

- 10 -

At a preliminary hearing, the Commonwealth does not have to present proof beyond a reasonable doubt as to each element of an offense – it is enough that the evidence "establishes probable cause to warrant the belief that the accused committed the offense." ***Commonwealth v. Karetny***, 880 A.2d 505, 513-14 (Pa. 2005); ***see also*** Pa.R.Crim.P. 542(D). Reasonable inferences may be drawn from the evidence to establish a *prima facie* case, and the reasonableness of the inferences is evaluated on a "more-likely-than-not" test. ***Commonwealth v. Wojdak***, 466 A.2d 991, 996 (Pa. 1983). "[T]he *prima facie* showing is a low threshold for the Commonwealth to surpass." ***Commonwealth v. Munson***, 261 A.3d 530, 540 (Pa. Super. 2021).

**"[T]he trial court is afforded no discretion in ascertaining whether, as a matter of law and in light of the facts presented to it**, the Commonwealth has carried its pre-trial, *prima facie* burden to make out the elements of a charged crime." ***Karetny***, 880 A.2d at 513 (emphasis added). "Weight and credibility of evidence are ***not*** factors at the preliminary hearing stage." ***Munson***, 261 A.3d at 540 (emphasis added).

With these points in mind, I will now examine each of the four charges at issue and explain how the trial court and the majority have adopted an improper evidentiary test for preliminary hearings.

**A.**

The first issue on appeal is whether the trial court erred as a matter of law in finding that the Commonwealth failed to establish a *prima facie* case as to the count of unsworn falsification. A defendant commits this offense where, "with intent to mislead a public servant in performing his official function, he: (1) makes any written false statement which he does not believe to be true[.]" 18 Pa.C.S. § 4904(a). In its opinion, the trial court gave little explanation for its disposition on this count, but Nathaniel Williams argues for the most part that he could not have made an unsworn falsification because his statements were not false, and even if they were false, Nathaniel Williams had not himself reduced them to writing. **See** Trial Court Opinion, 10/18/2021, at 8; Appellee's Brief, at 25-27.

The majority did not squarely address whether Nathaniel Williams lied to or misled Lieutenant Clough, but the falsehoods are so apparent from the record that they must be taken as a given. The majority's decision, therefore, hinges on a finding that Nathaniel Williams did not produce a "written false statement" for the purposes of Section 4904(a). **See** Maj. Op., at 9. Here too, though, the majority's reasoning is hard to discern, as the analysis is minimal and only one case was cited in support of the conclusion – **Commonwealth v. Gaithers**, 13 Pa. D&C.3d 668, 670 (Pa.C.P. Montg. 1978).

The majority's reason for citing **Gaithers** is not immediately obvious because it is a 1978 decision of the Court of Common Pleas of Montgomery

County discussing why a conviction for unsworn falsification was sustained by sufficient evidence. The defendant in *Gaithers* had signed a written statement using a false name when taken into police custody, and the court of common pleas rejected the defendant's recantation defense as a matter of law. The case had nothing to do with whether the evidence met the lower evidentiary standard applicable at a preliminary hearing.

I would hazard a guess that the majority intended to analogize the facts of *Gaithers* to those in the present matter. That is, since Nathaniel Williams signed his name on a document typed up by someone else, the only thing Nathaniel Williams himself put in "writing" was true, precluding his conviction for making a written false statement under Section 4904(a). If that is what the majority intended to suggest, it finds no support in *Gaithers*, the plain language of Section 4904(a) or any other authorities.

*First*, the fact that the defendant in *Gaithers* violated Section 4904(a) by signing a document with a false name in no way suggests that a defendant *cannot* violate the statute by signing an otherwise fraudulent document with his true name. Such facts were never contemplated in that case.

*Second*, Nathaniel Williams' conduct would clearly amount to "making" a false written statement, since his transcribed oral statements would be meaningless without the signed written attestation that the content or substance of the writings was indeed uttered by him. The record establishes that during their interview, Lieutenant Clough contemporaneously transcribed

Nathaniel Williams' verbal responses to questioning, and Nathaniel Williams then voluntarily adopted the entire transcription by initialing all six pages of the document. He further adopted the written statements by signing his name under the final clause, which reads, "I have read the foregoing statement consisting of six pages and it is true and correct to the best of my knowledge." Motion to Refile Hearing Transcript, 4/22/2021, at pp. 44-45.

These attestations make the document his own, just as if he had typed or written the document in his own hand. There is no cogent reason why a defendant would not be liable under Section 4904(a) for attesting to the truth of a false written statement that happened to be memorialized by a third party. In fact, it is commonplace for signatories to affidavits prepared by third parties to be subject to the penalties prescribed by Section 4904. **See e.g.**, 42 Pa.C.S. § 102 (definition of "affidavit" in the Judicial Code, including "an unsworn document containing statements of fact and a statement by the signatory that it is made subject to the penalties of 18 Pa.C.S. 4904[.]").

*Third*, and consistent with the discussion above, we have previously affirmed a conviction under Section 4904(a) where a false written statement was memorialized by a third party and then adopted by way of the defendant's signature. **See e.g.**, **Commonwealth v. Cherpes**, 520 A.2d 439 (Pa. Super. 1987) (holding that defendant could be convicted for making false written statements under Section 4904(a)(1) regardless of whether the defendant had personally memorialized the statements); **Commonwealth v Herd**, 81

Pa. D. & C.4th 85, 92 (Pa.C.P. Burks), **aff'd**, 935 A.2d 12 (Pa. Super. 2007) ("[Defendant] gave a signed written witness statement to the Colebrookdale Township Police Department detailing the events described above[.]"). Nathaniel Williams, therefore, "made" the written statements by attesting in writing that the statements were his and that they were true, subjecting him to liability under the statute.

The remaining elements of Section 4904(a) are the presence of a deliberately false statement and an intent to mislead. Again, the majority did not address these points, likely because it is so apparent from the record that there is ample record evidence proving these elements. However, in any event, a summary of the most pertinent facts will provide some useful context.

In his interview with Lieutenant Clough, Nathaniel Williams gave a false statement by denying having "spoken to" his cousin for the preceding year. Nathaniel Williams made this statement despite having communicated extensively with his cousin via phone calls and text messages at the relevant times. The two men also curiously *stopped* communicating right when Lieutenant Clough's investigation began. Nathaniel Williams even started using a new phone the day after Edwin Williams was interviewed.

Moreover, Nathaniel Williams denied that he used government databases to assist his cousin in learning the personal information of Ms. Williams, but there is compelling evidence that this is exactly what happened. The record easily supports the reasonable inference that Nathaniel Williams

- 15 -

looked up Ms. Williams' personal information at his cousin's behest, within minutes of having conversations with him and within two days of Edwin Williams' first encounter with Ms. Williams in a public parking lot.

Nathaniel Williams has claimed that he had a legitimate reason for his interest in Ms. Williams, denying that he looked up her information as a favor to his cousin. However, consideration of his alternative account, his credibility and the weight of conflicting evidence must be reserved for the jury in the first instance. The trial court was also not permitted to credit Nathaniel Williams' dubious story at a preliminary hearing because all reasonable inferences from the evidence had to be drawn in favor of the Commonwealth. *See id*. Thus, because Nathaniel Williams gave a false written statement to Lieutenant Clough with an intent to mislead, the trial court erred as a matter of law in denying the Commonwealth's motion to refile the charge of unsworn falsification.

**B.**

The next issue is whether the trial court erred in finding that the Commonwealth had failed to establish a *prima facie* case as to the count of tampering with or fabricating physical evidence (18 Pa.C.S. § 4910). A defendant commits an offense under Section 4910 if he:

> (1) alters, destroys, conceals or removes any record, document or thing with intent to impair its verity or availability in such proceeding or investigation; or

(2) makes, presents or uses any record, document or thing knowing it to be false and with intent to mislead a public servant who is or may be engaged in such proceeding or investigation.

18 Pa.C.S. § 4910.

At the two preliminary hearings, the Commonwealth's evidence allowed the reasonable inference that Nathaniel Williams added a notated photograph of Ms. Williams to a homicide file so that he could falsely establish the legitimacy of his prior inquiries using police databases. The Commonwealth established that during Lieutenant Clough's investigation, he reviewed a homicide file corresponding to a pending case Nathaniel Williams claimed he was working on when he looked up Ms. Williams' information. A hard copy of the homicide file was kept in the Homicide Division Unit of Nathaniel Williams' department, and it was designated with the number, M17-185. At Lieutenant Clough's request, the homicide file was retrieved by Nathaniel Williams' superior officer. The homicide file contained no references to Ms. Williams whatsoever.

It was only the day after being interviewed by Lieutenant Clough that Nathaniel Williams turned up a supplemental homicide file which, among other things, contained a printout of a Facebook photo, on the back of which Nathaniel Williams had made handwritten notes with some of Ms. Williams' personal information.

The majority reasons that the Commonwealth did not present a *prima facie* case as to the tampering charge because (a) there was no evidence as

to when the material about Ms. Williams was added to the second homicide file, and (b) there was no evidence that Lieutenant Clough received the entirety homicide file M17-185 on the date he initially retrieved it. Respectfully, the majority has erred by discounting reasonable inferences that Nathaniel Williams tampered with police records.

I have already recounted above how Nathaniel Williams lied to and misled Lieutenant Clough in connection with his use of police databases, diminishing his credibility. No doubt he also had a motive and opportunity to add materials to the homicide file in order to corroborate his purported reason for using those resources to inquire about Ms. Williams. Moreover, the purported incident prompting the searches – seeing a murder suspect enter a white van in Ms. Williams' neighborhood – is completely uncorroborated.

Nevertheless, aside from that, the contents of the second homicide folder were independently suspect. Lieutenant Clough described at length why he believed that Nathaniel Williams manufactured research in the homicide file only after the internal affairs investigation was underway:

> **Lieutenant Clough**: I inspected the contents of that [second] file folder as well. And it was within that file folder there were several references to Ms. Williams which included a Facebook photograph, a photograph of Ms. Williams and her children that was printed from Facebook. And on the back of it there were some handwritten notes. And the handwritten notes had some things such as it said Ms. Williams' name, no record/no wants, 75-48A negative, no friends shared, autism supporter, the abbreviation for possibly, p-o-s-s and neighbors.
>
> **Commonwealth**: Did it also include some of the biographical information of Ms. Williams like her license tag?

**Lieutenant Clough**:  The license tag, the one that I had queried previously, that was on there as well.  That was definitely on there along with those other things that I stated.

**Commonwealth**:  The Facebook picture, did that appear to you that it came from a publicly available Facebook profile?

**Lieutenant Clough**:  Yes, because I actually logged in and viewed it myself and I was able to see it without being restricted, without having to be a friend of Ms. Williams.

**Commonwealth**:  And those handwritten notes, was that all information that you would have referred to in Detective Williams interview with him?

. . . .

**Lieutenant Clough**:  Those things that were handwritten on there, yes.  They were in -- some of them were in the interview of Detective Williams, yes.  And he received a copy of that interview at the conclusion of his statement.

**Commonwealth**:  Besides that Facebook page and the notes on the back was there any other reference to Theresa Williams in the file?

**Lieutenant Clough**:  No, there was not.  I looked extensively through that file.  A lot of the inquiries that were made there was copies, there was printouts of various license plates, tags, houses that were checked.  And this was the only one, the only thing that was not printed out, it was just handwritten on the back of a Facebook page.

**Commonwealth**:  So you are saying this information was different from other checks that you saw in the file; is what you're saying?

**Lieutenant Clough**:  Yes.

Preliminary Hearing Transcript, 9/11, 2020, at pp. 77-80.

In sum, the only material in the second file about Ms. Williams was a print-out of a publicly available Facebook photo, on the back of which Nathaniel Williams had handwritten her personal information corresponding to the same information that Lieutenant Clough had provided to Nathaniel Williams at the conclusion of their interview the day earlier. Nathaniel Williams did not print out any of the queries of Ms. Williams from October 17, 2017. Unlike all of the other materials in the homicide file, the one piece of paper referring to Ms. Williams was publicly available, the information on the back of the photo was handwritten, and the inclusion of the photo into the file was not logged or time-stamped. How convenient.

The majority nevertheless seems to suggest that the Commonwealth had to present direct evidence as to when the Facebook photo was printed and when Nathaniel Williams wrote notes on the back of it. However, this is erroneous because at a preliminary hearing, courts are compelled to consider all the evidence of guilt (including circumstantial evidence) to make reasonable inferences of guilt that are more likely than not to be true, and to view the evidence in the Commonwealth's favor. Ignoring the inferences of guilt and accepting the explanations given by Nathaniel Williams amounts to an improper credibility determination and weighing of the evidence.

When viewed in the most favorable to the Commonwealth, the record facts and circumstantial evidence allow the reasonable inference that Nathaniel Williams added a photo to the second file to mislead Lieutenant

Clough and thwart an official investigation. The lack of direct evidence as to when the photo was added is of no moment, particularly because Nathaniel Williams himself made it impossible to track the date of that activity. Because Nathaniel Williams' conduct satisfies the elements of Section 4910, the trial court erred as a matter of law in ruling that a *prima facie* case had not been established as to this offense.

## C.

The trial court also erred as a matter of law in finding that the Commonwealth had failed to establish a *prima facie* case as to the count of tampering with public records (18 Pa.C.S. § 4911), graded as a third-degree felony. A person commits the offense defined in Section 4911 if he:

> (1) knowingly makes a false entry in, or false alteration of, any record, document or thing belonging to, or received or kept by, the government for information or record, or required by law to be kept by others for information of the government;
>
> (2) makes, presents or uses any record, document or thing knowing it to be false, and with intent that it be taken as a genuine part of information or records referred to in paragraph (1) of this subsection; or
>
> (3) intentionally and unlawfully destroys, conceals, removes or otherwise impairs the verity or availability of any such record, document or thing.

18 Pa.C.S. § 4911(a).

Where, as in this case, the offense is charged as a felony, it must also be shown that the defendant acted with an intent to "defraud or injure." 18 Pa.C.S. § 4911(b). "Fraud" generally means "anything calculated to deceive,

whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth or look or gesture." ***Moser v. DeSetta***, 589 A.2d 679, 682 (Pa. 1991).

Here, when viewed in the light most favorable to the Commonwealth, there is evidence which establishes a *prima facie* case. The majority found, and I agree, that the homicide file relied upon by Nathaniel Williams to establish the legitimacy of his inquiries into Ms. Williams was a "record, document or thing belonging to, or received or kept by, the government for information or record." ***See Commonwealth v. Barger***, 375 A.2d 756, 763-64 (Pa. Super. 1977) ("It is a written report of an investigation of a motor vehicle accident which, at the very minimum, is kept by the State Police for informational purposes.").

Where the majority and I differ is whether there is evidence that Nathaniel Williams altered the homicide file. The majority finds that such an alteration to the file is merely speculative, reiterating the idea discussed above that the Commonwealth had to present direct evidence that the material about Ms. Williams was added only after the internal affairs investigation began. ***See*** Maj. Op., at 14.

Once again, the majority is applying the wrong evidentiary standard in reviewing whether a *prima facie* case has been presented. Circumstantial evidence of the crime is sufficient, and a court's conclusions must be drawn

from all reasonable inferences that favor the Commonwealth. The elements of tampering (with intent to defraud) were proven circumstantially by irrefutable facts and reasonable inferences drawn therefrom:

- Theresa Williams was first accosted by Edwin Williams in a parking lot on October 14, 2017;

- Nathaniel Williams used police databases on October 17, 2017, within minutes of communicating with his cousin, Edwin Williams, to look up information about Theresa Williams;

- Nathaniel Williams and Edwin Williams then both lied to and misled an internal affairs investigator about the extent of their communications with each other at the relevant times;

- Nathaniel Williams suggested a link between Ms. Williams and a murder suspect that is both tenuous and uncorroborated;

- Nathaniel Williams produced a photo of Ms. Williams a day after his interview with Lieutenant Clough in a second homicide file that was for some reason not kept with the first file retrieved by Lieutenant Clough at the police department; and

- Unlike all of the other items in both homicide files, the one photo of Ms. Williams was publicly accessible, with handwritten notes on it which were not time-stamped.

The reasonable inference from this evidence is that Nathaniel Williams used official recourses to enable his cousin to stalk a woman and then tried to cover it up by manipulating a government record to make it appear that the woman was implicated in a murder investigation. While Nathaniel Williams has given innocent explanations for his conduct, it is not proper for a court at a preliminary hearing to disregard reasonable inferences of guilt by relying on the defendant's uncorroborated word, especially a defendant who has already been caught making false statements to an internal affairs investigator. The

trial court erred in ruling that the Commonwealth had not made out a *prima facie* case as to the count of tampering with public records.

**D.**

Finally, I would find that the trial court erred in ruling that the Commonwealth had not established a *prima facie* case as to the count of obstructing administration of law or other governmental function (18 Pa.C.S. § 5101). A defendant may be found guilty of this offense "if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act[.]" 18 Pa.C.S. § 5101. This crime requires more than "mere lying" or giving false information to a police officer. ***See Commonwealth v. Shelly***, 703 A.2d 499, 503 (Pa. Super. 1997). The conduct causing obstruction or interference must be an independently illegal act. ***See id***.

I have outlined above why the record evidence compels the inference that Nathaniel Williams lied to Lieutenant Clough during his interview and altered a homicide file to give the false impression that he made inquiries about Ms. Williams for a legitimate purpose. This conduct was sufficient to establish a *prima facie* case that Nathaniel Williams violated Sections 4904(a), 4910 and 4911 of the Crimes Code. Since there is no doubt that Lieutenant Clough was engaged in the administration of a government function during his investigation into Nathaniel Williams' conduct, all of the elements of Section 5101 were met. I would, therefore, hold that the evidence was sufficient to establish a *prima facie* case of guilt as to this count.

In dismissing the four charges that the Commonwealth brought against Nathaniel Williams and precluding the requested refiling of the charges, the trial court erred as a matter of law in misapplying the test for whether a *prima facie* case has been presented. Accordingly, I would reverse the trial court's order so that all four counts may be bound over for trial.